No. 2463

Second Circuit

THOMAS HUTCHINSON v. LOUISIANA CENTRAL LUMBER COMPANY AND SOUTHERN CASUALTY COMPANY

(December 10, 1925, Opinion and Decree) (February 8, 1926, Rehearing Refused)

(*Syllabus by the Editor.*)

1. **Louisiana Digest—Master and Servant —Par. 159.**

Where the injured employee suing under section 8, Sebsection 1 (b) of the Workmen's Compensation Act No. 20 of 1914 as amended by Act 43 of 1922, proves total disability at the time of the trial, the court will not venture a prediction as to when his condition will change to one of only partial disability or freedom from all disability but will leave this to be determined by the event, and give judgment as for total disability not exceeding four hundred weeks.

(The recent amendment of Section 8 of Act No. 20 of 1914 is Act 216 of 1924. Editor's note.)

Appeal from Eighth Judicial District of Louisiana, Parish of Caldwell, Hon. F. E. Jones, Judge.

This is a suit brought by an injured employee for compensation under Section 8, Subsection 1 (b) of the Workmen's Compensation Act No. 20 of 1914, against the employer and insurer. An exception no cause of action was filed by the insurer which was sustained. There was judgment for plaintiff and the defendant employer appealed. Plaintiff asked for an increase in judgment.

Judgment amended and increased.

Long and Crow, of Shreveport, and G. T.

McSween, of Shreveport, attorneys for plaintiff, appellee.

Thornton, Gist and Richie, of Alexandria, attorneys for defendant, appellant.

CARVER, J. Alleging total disability, plaintiff sued Louisiana Central Lumber Company, his employer, and Southern Casualty Company, its insurer, for compensation under the workmen's compensation law (Act No. 20 of 1914 as amended by Act No. 43 of 1922) for injuries received in an accident occurring January 28, 1924, arising out of and incidental to his employment.

The accident was, being thrown from a horse against a tree.

From a judgment sustaining an exception of no cause of action, filed by the defendant Southern Casualty Company, plaintiff does not appeal; so that defendant is eliminated.

The Louisiana Central Lumber Company admits that plaintiff suffered an injury on the date mentioned, but claims that he had completely recovered from its effects by March 12, 1925, up to which time it had paid him compensation at the rate of $11.88 a week, which was 60% of $19.80, his weekly wages at the time of the accident, and that it owes him nothing further.

The District Judge awarded compensation of $11.88 a week for total disability from the time of the accident till May 12, 1925, and $5.94 a week for partial disability from that time during such disability, not exceeding 300 weeks in all.

The judgment does not allow credit for the $689.04 paid by defendant to plaintiff.

Defendant appealed and plaintiff moves to amend the judgment by allowing $11.88 a week during disability, not exceeding

400 weeks. He does not contest defendant's right to the credit of $689.04, the failure to allow which was evidently due to inadvertence in drawing the judgment.

Defendants counsel contends in this court that plaintiff's condition is not one even of partial disability to do work of a reasonable character.

Plaintiff testifies that he is 65 years old; that he has done no work since the accident; that he does not rest "in a minute's peace at any time"; that his hip hurts; that he has no literary education; that the kind of work he has been used to is hard, physical labor, such as hauling logs, working on railroad tracks and things like that; that he cannot get around and cannot ride a horse; and that "when I undertake to do anything I cannot do it, that's all; when I go to sit down and get up I have to put my hands on something; I cannot sit in a chair like a man ought to".

Doctor Adair, radiologist, describing the radiograph taken, says:

"Anterior, posterior radiograph of the pelvis and hip shows an old fracture of the right femur. This fracture is oblique. The lower fracture is displaced upward and inward, causing a shortening of the limb of about one and a half inches, and deformity of. the femur. There is good union of the fracture."

He further testified as to the shortened leg:

"Q. Could that be corrected with a shoe, so that it would not interfere in walking to a great extent?
"A. I should think that he would get where he would not have much of a limp."

He further said by "old fracture" he only meant one of the last two or three days.

Doctor Sanderson says:

"I find the man on general inspection looks fairly healthy. He gave a history of having been working for the Louisiana Central Lumber Company, Camp 25, hauling logs. Horse bogged and he was thrown against a tree breaking his thigh as described. He looked like a fairly healthy man in general; an examination did not reveal anything except the right thigh, which I examined carefully. However, in walking, he has an apparent shortening of the right leg. An examination of the hip bone showed not a marked displacement. There is an apparent angulation. I did not measure the man's legs because I did not have his shoes off, but asked Dr. Adair to make the examination, and I usually go by the X-ray in shortening cases. Anyway I did not examine the shortness of the leg, except that it was apparent in walking. He has pain, has a marked point of tenderness nearly between the ischium and the line shown as the hip bone, which he complains of hurting him all the time, and especially when he sits down. Those were about the only findings."

"Q. These injuries that you note, will continue as they are, and be permanent, or not?
"A. The · injuries that I suspect, and having seen the x-ray and having the report on it, of course we know they will remain, and I might add that I found that both the thigh and the leg atrophied, thigh and leg muscles flabby, and the leg smaller than the other leg."

And he says further:

"Q. Doctor, I will ask you if you found an atrophied condition of both the thigh and leg?
"A. Yes.
"Q. What did that indicate?
"A. Would indicate disuse as compared to the other leg or some nerve disturbance, or both.
"Q. Was that what you call a pretty badly broken up limb and thigh?
"A. Taking into consideration the position and physical findings and the x-ray report I would not consider so unusual fracture, but the results make it a severe one."

Doctor Simmonds says:

"Q. With reference to the injury received by him about January 28, 1924, will

you please explain what that injury was, and what his present condition is with reference to that injury?

"A. You want to know the condition he was in at that time?

"Q. Yes.

"A. Well, he was a man about sixty years old, very much emaciated when he entered the hospital, and suffering with a fracture of the right femur, fracture extending through the trochanters, the greater trochanter standing pulled out at an angle of about forty-five degrees, and the inner trochanter pulled in against the paraneum, the spicula of the distal end of the bone extending up between the two fragments. The man was suffering from an arterio-schlerosis, three or four years' standing, I think. He was in a most desperate condition at that time. After treating him and keeping him confined in bed part of the time in a half sitting posture, for a period of five weeks, he was put in a rolling chair and finally allowed to be up on crutches, in which condition he was sent home, with the request that he return to see me within two or three weeks. We saw him on several occasions after this, and finally, on seeing him on February 2, 1925, we were astounded at his recovery, his general condition having improved so materially, his diarrhea entirely gone, and the function of his knee and hip very much improved. The union in this case was perfect, except for a slight shortening of the leg from three-quarters to an inch. He will, of course, have a slight permanent disability in this particular leg, on account of the shortening, but this will be very much compensated by the pelvis, the rotation of the pelvis and I dare say within a short while he will not even think of using a stick as he was using at the time he last appeared to see us, on February 2, 1925.

"Q. Doctor, with reference to the shortening of this leg, would a shoe with a little added sole eliminate the inconvenience of the slight shortening?

"A. Very much indeed. If he were a young man it would not be noticeable in the course of time.

"Q. Do you consider this man disabled in any extent on account of this accidental injury other than the slight shortening of his right leg?

"A. No, for the reason that he has the use of all of his muscles; there is no injury to the nerves; the leg is building up in

size, and he has good function of the knee, and almost complete function of the hip joint.

"Q. In making your various examinations of this patient and in treating him, did you make use of the x-ray?

"A. I did. He was x-rayed more than once at the Baptist hospital of this city, and also in my office, by my partner, Dr. King Rand.

"Q. From your treatment of this patient, and your various examinations of him since his injury up until February 2, 1925, is it your opinion that this man is disabled from doing reasonable labor as a result of that injury?

"A. No, there is no reason why he should not be capable of doing any reasonable manual labor.

"Q. This man was a teamster. Do you believe at the present time or at the time you last examined him, that he is practically able to perform the services of a teamster now, as he was before his injury?

"A. I think so.

"Q. Is his general physical condition better or worse than it was prior to the injury?

"A. He is practically a well man now, whereas, when he entered the hospital he was, I considered, a very ill man, regardless of whether he had been injured or not. He had chronic diarrhea of possibly three or four years' standing, which we treated him for at the time.

"Q. In addition to this, did he have some kind of arterial trouble?

"A. Yes, arterio-schlerosis, or hardening of the blood vessels.

"Q. That is improved?

"A. Very much indeed, by the rest.

"Q. Did you have him under treatment all the time from the time he was injured, until February 2, 1925?

"A. All of the time until he left the hospital. I don't know the exact date he left the hospital, and I observed him on several occasions since that time, as he would return to the office.

"Q. Doctor, was the results of the repair of that limb what you would consider good or bad?

"A. Taking into consideration the man's age and physical condition, the unusual fracture received, the results are better than I could have possibly expected at first.

"Q. It has been testified to by one of

the physicians testifying, for plaintiff, that this man's thigh and leg were in an atrophied condition; possibly you can explain why that condition existed.

"A.  Certainly.  In the first place, the man was a laboring man, had been accustomed to a very active life, and when he received this injury it was a very severe one, it is natural that the muscular action would cease, and especially as it was necessary to place this man's limb at complete rest putting the muscles all in a tense and stretched condition, the muscles themselves became impoverished from lack of use, and as a result, the leg became very much atrophied until the patient was able to use the leg.  After the had become more active, the leg again began to develop, and within a reasonable time the difference in size of the two legs will not be noticeable.

"Q.  Does this atrophy and flabby condition of the muscles occur in all fractures of limb?

"A.  All fractures where the limbs are put at rest.

"Q.  Where those limbs are used after the fracture has been repaired, do they usually acquire their normal strength and size?

"A.  Yes, from exercise.

"Q.  In your opinion is there any reason why this leg should not acquire its usual size and strength by regular use, in a reasonable time.

"A.  There is no reason why it should not.

"Q.  What would you call a reasonable time?

"A.  It depends upon how much use the man makes of the leg; how much effort he makes at exercising the leg properly.

"Q.  Is not the duration of the atrophic condition due entirely to the activities of the particular patient?

"A.  Yes, sir.

"Q.  As I understand it, a patient with a fractured limb, if he declines to use the limb actively, can occasion himself disability through atrophy and weakness of that limb, for a considerable length of time?

"A.  He can.

"Q.  As I understand it, on the contrary, if he would put himself to some extra effort to use this limb, such atrophic condition would remedy itself much more rapidly?

"A.  It would."

Defendant introduced no testimony showing what, if any activities, plaintiff had actually engaged in since the accident.  The District Judge having allowed compensation for full disability up to the time of the trial, must have regarded plaintiff as totally disabled at that time to do work of any reasonable character.  On the testimony above quoted, we cannot say he manifestly erred.

Defendant's counsel called attention to the fact that neither Doctor Adair nor Doctor Sanderson, who were plaintiff's witnesses, was asked whether there was disability and asks us to infer that if he had asked their opinion would have been against him.

Defendant was represented by counsel at the examination and could have asked this question as well as plaintiff.  We think no inference should be drawn either way.

Doctor Simmonds says nothing about plaintiff's pain or claim of pain.  In two of his answers he seems to express the unqualified opinion that plaintiff is and was when he saw him last on February 2, 1925, able to do work as a teamster or any other work of a reasonable character; but much of his testimony relates not altogether to his condition as it was but in part at least to what he expected it to be.  He saw him last on February 2, 1925, and says at that time the functions of his knee and right hip were very much improved and that he had good function of the knee and almost complete function of the hip.  We infer from this it was not quite well.

He further says there will be a slight permanent disability of the leg on account of shortening.  We are not sure he meant that plaintiff, when he saw him last, was not under some disability, but, if so, we cannot attach to his opinion a weight suf-

ficient to overcome the opinion of the lower court supported by plaintiff's statement that he cannot work at all and the undisputed fact that plaintiff's leg is shortened with a displacement of some of the bones.

The District Judge has not furnished us with his reasons for awarding compensation from the date of the trial on the basis of 50% reduction in earning capacity. Defendant claims that because Ouachita & Northwestern Railroad Company offered plaintiff a job as section foreman at $3.50 a day, which was about what he was earning, which offer plaintiff refused unless they paid him $500.00 cash, this shows that his earning capacity is not diminished, that he is not disabled, and that he is keeping from work because he prefers to draw compensation instead of wages.

The offer of the foreman job was made in June, 1924, five months or less after the accident, during the time that he was under treatment or at least under observation by Doctor Simmonds, and plaintiff says he could not do the work then.

Manes says that a section foreman on a small railroad as a rule does not do anything except oversee but sometimes lifts rails and ties and helps pump the handcar.

And he says, further:

"Q. Suppose in addition to that broken leg he had a projection of the thigh bone sticking into his hip or buttock so that he was unable to sit down with ease at any time. Do you think that would interfere with his work?

"A. Well, it probably would."

Considering the nature of the injury and the condition in which it left plaintiff's leg, we have no sufficient reason to doubt the truth of plaintiff's testimony that at the time he was not able to do the work of a foreman, at least the lifting and pumping. In fact no effort was made to prove that at that time he was able to do manual labor, the impression we get from the testimony being rather that he was offered a position not requiring such labor. The fact that he was offered this job is not, to our mind, proof that he was able to do work of any reasonable character such as he had been accustomed to. Nor does it, in our opinion, establish plaintiff's earning capacity. We are satisfied that the job was not offered him on his merits as a workman in his then condition. If offered for philanthrophic motives or because defendant preferred to pay wages rather than compensation, we do not think we should accept the bare offer as proof of earning capacity.

Furthermore, defendant continued to pay compensation for full disability up to March 12, 1925, about nine months after the offer was made.

Counsel for defendant argue as though he refused the job unless it was secured to him for life and unless, further, he was paid $500.00 in cash.

This, though, is not in accordance with the proof. The job of foreman was offered to him in June, 1924, at which time there was no discussion of any such payment, and plaintiff says he refused the job then because he could not do the work. The demand for $500.00 was made only about April, 1925, at which time no job was offered him but, on the contrary, he was informed that they had no such job. Plaintiff's testimony on that point, which is not disputed, is as follows:

"Q. Do you remember the conversation you had with C. B. White and J. B. Bolton and in that conversation they offered to pay you five hundred dollars and you said if they would pay you five hundred dollars and a life time job you would accept it?

"A. They kept after me to come to Alexandria for an examination and I went down there and Dr. Simmonds examined me and put on the report card 'partial disability' and Mr. Bolton says 'I will give you two hundred dollars and you can go back home happy', and I says I couldn't accept that. Finally he asked me what I would do and I told him I would accept five hundred

dollars with a life time job of something I could do, and then later on the latter part of April they sent for me to come into Clark's and I went in and Mr. Bolton was there and he proceeded to offer me three hundred dollars to settle and I told him I would agree to it if they would give me a job that I could do and Mr. White spoke up and said Mr. Slagle didn't have that kind of a job. Mr. Bolton figured a while and said 'I will give you $400.00 with five per cent· discount. I asked him what the discount was for and he said if you go to the bank for the money you would have to pay five per cent discount.

"Q. You refused to take the job without the money?

"A. I refused to take the job without the money. I refused to take it because I couldn't do anything except section foreman job and that hasn't been offered to me since last June."

The District Judge evidently thought that total disability continued down to the time of the trial on May 12, 1925. We do not see any basis in the proof for placing it, thereafter, on a basis of 50% of earning capacity. The plaintiff swore he could not do anything at all, by which we understand him to mean, anything requiring manual labor. He knows whether he can or not. It may be, and counsel for defendant evidently think that he is merely pretending, but we do not find in the record sufficient reason for so holding.

Dr. Simmonds' testimony ignores plaintiff's pain or claim of pain and, as said above, it is in part at least predicated on what he expected to take place and not wholly on plaintiff's condition when he last saw him.

Dr. Sanderson says the atrophy may be due to disuse or to nerve injury or both. He was not asked which he thought actually the case.

Dr. Simmonds says it was disuse and that there was no injury to nerves or muscle. He does not say how he knows there was no injury to nerves and we are not informed why he was not told of plaintiff's claim that he suffered pain. No doubt the atrophy was due at least in part to disuse, but if plaintiff does suffer pain this may show that there was some injury to the nerves, and even if the disuse was due to the pain, we cannot say that plaintiff should have worked in pain.

The fact that he was willing to take a job not involving manual labor, such as foreman's job without lifting and pumping does not, we think, establish earning capacity, at least without proof that some such job was reasonably attainable. Defendant had no such job and we are sure that considering plaintiff's age and condition it is a mere chance whether he can obtain such a job or not.

If Dr. Simmonds was informed of plaintiff's claim of pain and disbelieved it, giving his answer because of this disbelief, his testimony does not disclose the reasons for such disbelief and we find nothing in the record which would justify us in entertaining a similar disbelief.

We have carefully read the plaintiff's testimony over and over and it strikes us as being apparently frank and candid. We see no evidence of evasion or of a disposition to conceal the facts. The law makes interested parties competent witnesses and while their statements are to be weighed and considered in the light of this interest, yet they cannot be disregarded merely because of the interest. Perhaps in stating that plaintiff suffered pain, Doctor Sanderson did not answer with the usual reserve of a medical expert. Such experts generally testify merely that the patient says he has pain. If this was a mere inadvertence in the part of the witness, at least it shows that he did not himself observe any reason to question the truth of the plaintiff's claim.

We have decided in several cases that where the condition of the injured workman at the time of the trial was one of total disability which was likely to last a long time, we would not venture on prediction as to when his condition would change to one of only partial disability or freedom from all disability but would leave this to be determined by the event.

See:

Chandler vs. Oil Fields Gas Co., 2 La. App. 778.

O'Donnell vs. Fortuna Oil Co., 2 La. App. 462.

King vs. McClanahan, 3 La. App. 117.

We are satisfied that this view of the law is correct. It cannot injure the employer because if restoration to ability to work does take place the employer can obtain modification after a year by availing himself of the right of review granted by the statute. If, though, we should indulge in prophecy and determine that the plaintiff was going to recover, wholly or partially, within a certain time in the future, and the prophecy should not come true, the effect would be to cut off plaintiff's right to a 100 weeks' compensation even though the disability should continue beyond three hundred weeks.

For these reasons, it is ordered, adjudged and decreed that the judgment of the lower court be amended by decreeing plaintiff entitled to compensation at the rate of $11.88 a week during disability, not exceeding 400 weeks, beginning February 5, 1924, together with 5 per cent per annum interest on each installment from the time of its maturity; subject, however, to a credit of $689.04 to be imputed to the first installments due.

It is further ordered that as thus amended the judgment of the lower court be affirmed.