No. 633

First Circuit

SIMMONS v. LONG BELL LUMBER CO.

(June 9, 1930. Opinion and Decree.)

S. I. Foster, of Leesville, attorney for plaintiff, appellee.

Thornton, Gist & Richey, of Alexandria, attorneys for defendant, appellant.

MOUTON, J. While in the employ of defendant company loading posts for shipment, a post fell on the elbow of plaintiff's left arm, causing, plaintiff alleges, a total and permanent loss of the use of that arm. Plaintiff was paid compensation by defendant at the rate of 65 per cent of his daily wage, $11.70 per week, during a period of 52 weeks after the accident, but declined thereafter to continue these payments. Plaintiff claims that he was entitled to that weekly compensation for a period of 200 weeks, and brought this suit to enforce the payment of that weekly allowance during an additional period of 148 weeks for which he obtained judgment.

Defendant company appeals.

The moment plaintiff was injured he quit his work and the car was loaded with the posts for shipment by his fellow laborers. A couple of days thereafter he reported to Dr. Frazier, the company's physician, for treatment. Plaintiff says the post broke the skin on his elbow, deadened or knocked all the feeling out of his arm. He says he is a common laborer accustomed to heavy work, and since the accident has been unable to do work for which he is fitted. He says, however, that since then he has been working in a garage at Rosepine, doing things that he is able to do, such as changing auto tires, and fixing punctures. He worked at the garage about two months at $1.50 a day, and left there two months prior to the trial. He explains that at night while in bed if he happens to get his injured arm over his head, to move it around he must use the other hand. This indicates that his arm is in an atrophied condition, which he explains in his testimony where he says: "My arm feels just like it is asleep." He testifies that in the last six months his arm has "grown worse." As to his arm being in a worse condition when the case was tried than when the accident occurred, there seems to be no disagreement between the witnesses. In other respects, however, the

physicians, two for plaintiff and two for defendant, differ on most of the essential points in the case. It is axiomatic that physicians will differ.

Dr. Reed, expert for plaintiff, says he examined plaintiff's arm about a week before the trial. He found his left arm atrophying, muscles flabby, no tone to them, his left arm smaller than the other, and, if he turned his arm, it dropped "like it had all this bone here out of socket." He says the muscles of that arm would continue to atrophy, and in the next twelve months his arm would hang from his shoulder and would be "no good at all."

Dr. Talbot, plaintiff's other physician, testifying along the same lines, says he found atrophy in the left arm and shoulder of plaintiff, and loss of function therein to practically 100 per cent as to his ability to work at manual labor. This opinion of the physician was the result of an examination made about four or five days before the trial.

This atrophying of the arm to the shoulder Dr. Reed ascribes to the blow plaintiff received on his elbow. He explains that by indirect violence there resulted "an injury to the shoulder, a trauma." He attributes the atrophy to the nerve injury, and not to non-use or disuse of the arm to which the two physicians sworn by defendant company would ascribe it.

Dr. Talbot is also of the opinion that the atrophy was the result of a nerve injury caused by the blow on plaintiff's elbow, as such an injury, he testified, affects the whole arm. Drs. Reed and Talbot admit that disuse of the arm might bring about an atrophied condition, but, in the case at bar, concluded after examination that it had been caused by the blow plaintiff received.

Dr. Frazier, physician of defendant company to whom plaintiff first reported after the accident, says that he instructed plaintiff to take certain exercises of the arm to prevent the atrophying of that member. Plaintiff states that he followed the instructions of the doctor. There is nothing to indicate that he did not. The fact is that plaintiff found work in a garage, as above stated, where he was employed during a period of about two months. He says he fixed punctures on tires, and changed tires. It is obvious that this character of work required the use of the hand and arm very probably in a slight degree, but as much as he could. In explaining the work he was trying to do, he says, 'to use his own language: "Things I can't do, like a fellow getting to a bolt with his left hand or a generator or a starter, I can't do it." This testimony clearly implies that he tried to use his left arm and hand, but was unable on account of his disability, and negatives the idea of nonuse or disuse of his arm which counsel for defendant company would ascribe as the cause of the atrophy.

Dr. Rand, expert for defendant company, having testified about the different types of exercise that might have improved the condition of plaintiff's arm was directed to the fact that plaintiff had worked in a garage where he had had exercises suitable to his condition. Referring to his work at the garage for two months, the doctor said:

"I think that it is commendable and has probably been beneficial because none of us can say what condition he would be if he hadn't worked, I think he would have been worse."

The fact is that he was worse at the time of the trial than he was immediately after receiving the injury by the post falling on his elbow. Although he took commendable and beneficial exercise at the garage,

and had also followed the instructions of Dr. Frazier, in taking the exercises prescribed for him, still he grew worse as time wore on, and was in that condition more than one year after the accident when the case was tried.

In Hutchinson vs. Louisiana Cent. Lumber Co., 3 La. App. 413, the court said that:

"Where total disability is shown at the time of the trial, the Court will not venture a prediction as to when the condition will change to one of only partial disability or freedom from all disability but will leave this to be determined by the event and will give judgment for total disability." See, also, Quattlebaum vs. Texas Pipe Line Co., 4 La. App. 406.

Here, the testimony of Drs. Reed and Talbot which is supported by the preponderance of the evidence shows that plaintiff's disability in the left hand and arm was total and permanent, the court under such evidence will not therefore inquire as to when the plaintiff might recover, but will grant judgment for compensation. The fact is that in this case there is no testimony or evidence which could possibly enable us to fix with any degree of certainty the probable duration of plaintiff's disability. The proof is that plaintiff took proper and beneficial exercises after the accident without obtaining any improvement in his condition. On the contrary, it grew worse instead of improving. Such being the situation, no improvement could, under the evidence, be expected in the future upon which the court could venture the prediction of future partial disability or freedom from all disability.

The judgment rendered below in favor of plaintiff for compensation during 148 weeks in the amount demanded with legal interest and attorney's fees, as therein decreed, is therefore affirmed, with cost.